**GEORGIA PUBLIC SERVICE COMMISSION, et al., Petitioners,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

No. 82–8643.

United States Court of Appeals, Eleventh Circuit.

May 2, 1983.
Rehearing and Rehearing En Banc Denied June 28, 1983.

2. Lewis Carroll, *Alice's Adventures in Wonderland,* Chap. 6.

Michael J. Bowers, Atty. Gen., Robert S. Stubbs, III, H. Perry Michael, J.O. Llewellyn, Thomas D. Watry, Asst. Attys. Gen., Atlanta, Ga., for Georgia Public Service Com'n and Georgia Dept. of Transp.

John P. Tucker, Jr., Atlanta, Ga., and Oliver H. Doss, Jr., Blue Ridge, Ga., for Fannin County, Ga., Zyrian Stone, Inc., City of Blue Ridge, Ga., and Mason Tractor Co., Inc.

John H. Broadley, Robert J. Grady, I.C.C., Washington, D.C., Frederic Freilicher, John J. Powers, III, Dept. of Justice, Washington, D.C., for respondents.

R. Lyle Key, Jr., Asst. Gen. Sol., Family Lines Rail System, John Wilson Humes, Jr., Asst. Gen. Atty., Jacksonville, Fla., for intervenor L & N R. Co.

Thomas H. Davis, Jr., Raleigh, N.C., for intervenor petitioner North Carolina Dept. of Transp.

Before GODBOLD, Chief Judge, KRAVITCH, Circuit Judge, and TUTTLE, Senior Circuit Judge.

1. Petitioners include the Georgia Public Service Commission, Georgia Department of Transportation, Fanin County, Georgia, City of Blue Ridge, Georgia, the North Carolina Department of Transportation, Zyrian Stone, Inc., and Mason Tractor Company, Inc.

2. L & N intervened on behalf of respondents.

3. The Murphy Branch is a 23.3 mile stretch of railroad between Murphy Junction, Georgia and Murphy, North Carolina. The line, which "traverses a mountainous, largely rural area," serves the area's primary industries, those being pulpwood and decorative stone products. Evidence indicates the line was in better shape five years ago when originally placed on the L & N system map for abandonment; currently the track is rated FRA I, restricting top speeds to ten miles per hour. Service currently is limited to once a week, on Saturdays.

KRAVITCH, Circuit Judge:

Petitioners[1] appeal from the decision of the Interstate Commerce Commission ("ICC") permitting the abandonment by the Louisville and Nashville Railroad Company ("L & N")[2] of a railroad line known as the "Murphy Branch."[3] We must decide whether the decision to permit the abandonment is unsupported by substantial evidence, or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . ." 5 U.S.C. § 706(2)(A). We also must resolve several procedural questions. We reverse, finding that under either of the above standards the record does not support the determination of the ICC.[4]

*Abandonment*

L & N filed an application seeking authority to abandon the Murphy Branch on December 31, 1981. By initial decision of May 28, 1982, the Administrative Law Judge ("ALJ") denied the application, and L & N appealed to the Commission. On September 10, 1982, the Commission reversed its ALJ and granted the abandonment. Petitioners filed an appeal in this court. They moved for a stay pending judicial review, which motion was denied without prejudice. Several Petitioners also appealed to the Commission for rehearing. On November 22, 1982, the ICC affirmed its previous decision.[5] Following oral argu-

4. Accordingly, we need not resolve the procedural issues, all of which were raised by Petitioners.

5. The Commission released its first opinion on September 10, 1982. The notice of appeal was filed in this court on October 8, 1982. The Commission released a second opinion in response to several Protestants' administrative appeal on November 22, 1982. The second opinion of the Commission was not before us, therefore, placing our jurisdiction in jeopardy. *See* 5 U.S.C. § 704 (court may only review "final" agency action); *American Lines v. Black Ball Freight Express,* 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970) (ICC may amend judgment so long as does not interfere with jurisdiction of court). After argument, however, Protestants moved this court to amend its petition for judicial review to include the November 22, 1982 decision. We granted the motion, bringing both decisions of the ICC before the court.

ment we granted a stay of the abandonment and any ancillary proceedings.[6]

The Revised Interstate Commerce Act permits a railroad to abandon any part of its railroad lines subject to ICC jurisdiction upon a finding by the Commission that the "present or future public convenience and necessity require or permit the abandonment...." 49 U.S.C. § 10903(a). In making its finding the ICC specifically is charged with considering whether the abandonment will have a "serious, adverse impact on rural and community development." *Id.* If these requirements are met the ICC "shall issue to the rail carrier a certificate [of abandonment]." *Id.* (b)(2).

■ Courts consistently have held that a finding of public convenience or necessity involves balancing competing interests: "[t]he benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce." *Colorado v. United States,* 271 U.S. 153, 168, 46 S.Ct. 452, 456, 70 L.Ed. 878, 885 (1926). *E.g., State of Texas v. United States,* 642 F.2d 87, 90 (5th Cir.1981)[7]; *State of Nebraska v. United States,* 255 F.Supp. 718, 721 (D.Neb. 1966). As we stated in *State of Texas v. United States,* 642 F.2d at 90:

> The Commission's role in abandonment proceedings is to balance the immediate and local interests of the community and the shippers against the broader public interest in freeing interstate commerce from undue burdens. The ICC must consider whether the branch line is profitable or whether it imposes a drain on other

income, as well as the likely expense of continued operation, ....

(citation omitted). Balancing requires the ICC to take into account a number of relevant factors, including the profitability of the line and the expense of continued operation, *Purcell v. United States,* 315 U.S. 381, 384, 62 S.Ct. 709, 710, 86 L.Ed. 910, 914 (1942), the likelihood of the line's future profitability, *People of the State of Illinois v. United States,* 666 F.2d 1066, 1079 (7th Cir.1981); *State of Texas,* 642 F.2d at 89, the availability of alternative transportation, *People of the State of Illinois,* 666 F.2d at 1080; *State of Texas,* 642 F.2d at 89, and the congressionally mandated examination of the harm to rural communities. 49 U.S.C. § 10903(a). This appeal challenges the Commission's review of these factors.

L & N filed an application for abandonment with the ICC because it determined that the line was not profitable, was unlikely to become profitable in the future, and that the resources spent in maintaining service could better be utilized elsewhere on the system. The abandonment was protested vigorously by numerous state and municipal governmental agencies and shippers. The Protestants argued L & N deliberately downgraded service on the line over a period of time and refrained from soliciting, or actually discouraged, additional shippers so the line would not become profitable. Protestants further asserted that business on the line had steadily increased despite difficult economic times, and would become profitable upon improvement of the economy, if not sooner. Protestants expressed

---

**6.** The statutory scheme requires that after the Commission permits an abandonment there be a ten-day period during which any person may offer to purchase the line. The Commission then has fifteen days subsequent to the offer during which it must determine whether the offer comes from a "financially responsible person" offering sufficient funds. If this occurs and the parties cannot agree on appropriate compensation for the line, the Commission may establish the conditions and amount of compensation. 49 U.S.C. § 10905.

Subsequent to the Commission's grant of permission to abandon the State of Georgia triggered the statutory scheme in § 10905 by making an offer to purchase the Murphy

Branch. Then, the Commission established the "conditions and amount of compensation." We stayed the obligation of the State to accept or withdraw the offer, however, pending review in this court, because the State repeatedly has asserted it does not wish to buy the line unless abandonment is a certainty. Because we reverse the grant of abandonment, the State of Georgia's offer to purchase is voided.

**7.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

the fear that once L & N abandoned the Murphy Branch, it would proceed to abandon its main line into the area, that line having been deprived of any revenue from the Murphy Branch. Finally, Protestants claimed that as no alternative transportation for their industries existed the industries would likely be driven out of business, thereby causing great harm and loss of jobs to this rural area already suffering from severe economic depression.

Based on the evidence submitted as verified statements, and upon cross-examination on the record, the ALJ ruled against the railroad, denying the certification of public convenience and necessity necessary for abandonment. The ALJ accepted L & N's contention that the Murphy Branch was not profitable, explicitly stating that "[n]othing stated above should be taken to infer than L & N should be, or can be, required indefinitely to continue to provide service on the Line at an annual deficit. Under the statute, indeed under the constitution, such a requirement could not long be imposed." The ALJ found, however, that "from a cost, service and availability standpoint the shippers located [on the Murphy Branch] *have no viable transportation alternative, and the fact that traffic on this Line is on the rise and not on the decline,*" (emphasis supplied).

The ALJ specifically addressed the impact of the abandonment on "rural and community development" noting that "[i]t is reasonable to conclude that the Congress [by specifying this criterion in the statute] attached more than a passing importance to this factor." Based on the testimony the ALJ found that in the face of abandonment "[t]he pulpwood and decorative stone industries in the communities would be virtually destroyed.... Even if these businesses were able to survive by relocating, as suggested by applicant, they would be lost to these communities."

The Commission found otherwise. It termed the financial burden on L & N, around $200,000 a year including opportunity costs, to be "substantial." It also found that the extent of future traffic potential was unsubstantiated on the record. The ICC thus concluded:

> ... a number of shippers might be forced to close or relocate as a result of the loss of L & N's rail access, and local communities may also be harmed to some extent as a result of the loss of employment and tax revenues which these industries provide. However, we find on the evidence before us, that the substantial burden on the carrier in continuing service outweighs the potential adverse effects on shippers and local communities which may result from abandonment.

*Review*

Our review of the Commission's decision is limited by the breadth of discretion accorded the ICC in determining when an abandonment is in the public convenience or necessity. *State of Texas v. United States,* 642 F.2d at 89; *cf. Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 292, 95 S.Ct. 438, 445, 42 L.Ed.2d 447, 460 (1974) (public convenience and necessity to transport commodities). It is the conclusion of the Commission alone that we review. *State of Texas, supra* at 89. We may only overturn the decision if it is unsupported by substantial evidence, 5 U.S.C. § 706(2)(E), or if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (A).[8]

---

**8.** In *State of Texas v. United States,* 642 F.2d 87 (5th Cir.1981) the court applied the substantial evidence test in reviewing a decision of the ICC to permit the Southern Pacific to abandon a portion of its line. *Id.* at 89. We are bound by that decision, which squarely holds that review of a Commission abandonment decision is by application of the "substantial evidence" *and* "arbitrary and capricious" tests. *Id. See* note 7, *supra* (Eleventh Circuit bound by decisions of former Fifth Circuit). We note, however, that at least one court has rejected use of the substantial evidence test when reviewing abandonment proceedings, because the hearing in abandonment is not "on the record" as required by 5 U.S.C. § 706(2)(E), as that phrase is construed in *United States v. Florida East Coast Ry. Co.,* 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). *See People of the State of Illinois v. United States,* 666 F.2d 1066, 1071–72

Although the parties agree generally with the scope of our review, they differ on the effect of the Commission's reversal of its ALJ. Petitioners argue that our scrutiny must be critical in the areas where the Commission differed with the ALJ, and that the differences must be clearly explained. It is the position of Respondents that the Commission is free to draw its own conclusions from the record and apply its expertise in weighing the evidence.

The "substantial evidence" test takes into account not only evidence supporting the conclusions of the ICC, but evidence which detracts from those conclusions as well. *Universal Camera v. NLRB,* 340 U.S. 474, 486, 71 S.Ct. 456, 463, 95 L.Ed. 456, 467 (1951); *McHenry v. Bond,* 668 F.2d 1185, 1190 (11th Cir.1982). Part of the record we review is the initial decision of the ALJ. *Id.* That does not mean that when the record is susceptible of two interpretations we will readily overturn the Commission in those situations where it differs from the ALJ. However,

> evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion.... The significance of the ALJ's report, of course, depends largely on the importance of credibility in the particular case.

*Universal Camera,* 340 U.S. at 496, 71 S.Ct. at 469, 95 L.Ed. at 472.

This same principle applies with regard to the arbitrary and capricious standard. "Under the 'arbitrary and capricious' standard the scope of review is a narrow one." *Bowman Transportation, Inc., supra,* 419 U.S. at 285, 95 S.Ct. at 441, 42 L.Ed.2d at 455. All the agency must do is articulate a rational connection between the facts and its conclusions. *Id.* 419 U.S. at 285, 95 S.Ct. at 441, 42 L.Ed.2d at 456. Where, however, the agency finds facts that differ from those of its ALJ, or concludes differently on the same facts, it is reasonable to require an explanation for the difference. *People of the State of Illinois v. United States,* 666 F.2d 1066, 1074 (7th Cir.1980); *cf. McHenry v. Bond,* 668 F.2d 1185, 1190 (11th Cir.1982) (agency decision must be "reasoned" and of "sound rationale").

We proceed, therefore, to review the determination of the ICC as to several factors relevant to abandonment. We do so with deference to the expertise of the agency, and concomitant respect for its ability to weigh the evidence in light of its expertise. Even with this degree of deference, however, we conclude that as to several of the relevant factors, the Commission's determinations have little or no support in the record, and that the Commission therefore failed to comply with its statutory responsibility. These factors we proceed to review.

*Alternative Means of Transportation*

One factor significant to the balance of public convenience and necessity is the availability of alternative transportation for shippers currently using the Murphy Branch. As noted, the ALJ found "from a cost, service and availability standpoint the shippers located thereon have no viable transportation alternative, ..." The Commission disagreed. It found that while abandonment "would deprive shippers of their most convenient transportation alternative," other transportation alternatives are "operationally feasible," and the problem of transportation is not "insurmountable."

The record fails to support these conclusions of the Commission. L & N's only witness on the issue of alternative transportation was its Assistant Manager— Commerce, Floyd E. McClamrock. McClamrock testified as to three significant aspects of alternative transportation, yet his testimony proved very little. First, McClamrock submitted a list of common carriers serving the relevant geographic

(7th Cir.1981) (discussing standard of review; rejecting "substantial evidence" in favor of arbitrary and capricious standard).

area. Cross-examination revealed, however, that McClamrock took the names out of the *motor carrier* directory without verifying whether the carriers were in business or could serve the pulpwood and decorative stone industries. Second, McClamrock testified as to the major highways serving the Murphy Branch geographic area. The impression given is that the highways provide immediate access to the area. When asked whether it was not true that the nearest major highway was 65 miles away, and the farthest 100 miles away, however, McClamrock stated he did not know the distance, he only knew there was access. His reason for discussing the highways was to "indicate highways are available if the motor carriers want to use them," yet McClamrock admitted he was not familiar with any decorative stone company or pulpwood buyer that trucks its products 75–100 miles to market. Tr. at 154.

Finally, and most significantly, McClamrock testified as to how the shippers on the line would move their freight if the road were abandoned. For example, McClamrock concluded the stone shippers would load their products over a team track at Copperhill or Blue Ridge. When asked how the stone would get to these tracks McClamrock said "[i]t would move over the road," *id.* at 124, but he had no idea who was going to haul it. When questioned as to the genesis of these alternative means, McClamrock divulged under cross-examination that these alternatives were what the "Atlanta Sales Office and some of the men there ... said ... their anticipation [was] that that would be the case." Tr. at 124.

The lack of depth of McClamrock's testimony was such that even the ALJ was led to comment, on the record. After considerable cross-examination of McClamrock, who admitted that he never spoke to any of the Murphy Branch shippers concerning alternative transportation, the following colloquy ensued:

Judge Clermon: "Really, Mr. Witness, on what do you base these two statements [concerning alternative transportation] that you made here?

Mr. McClamrock: As I stated previously, Your Honor, all we could do is talk to our sales people in the Atlanta Office and get their overall opinion of how this traffic might be diverted to major transportation, whether it would be truck or team track or whether it would be loaded to Southern Railway at Murphy and just get—it is just their opinion.

Judge Clermon: In other words, what you are saying here is based on the statements made to you by those people?

Mr. McClamrock: Yes, sir.

Judge Clermon: Do they go into the reasoning behind that?

Mr. McClamrock: No, sir, they did not. Tr. at 136.

The testimony introduced by Protestants is in sharp contrast to L & N's speculative evidence. For example, Jack Hughes, of Hughes Wood Yard, testified that he had looked into transporting wood by truck instead of by rail. The motor common carriers serving the area declined to ship the wood. Tr. at 425. Of several private contract carriers consulted, only one expressed interest, but the cost was not economically feasible. *Id.* at 427. In addition, if Hughes were to ship by truck he would have to purchase his own trailers at ten thousand dollars apiece; he would need six trailers to ship the amount of wood he currently ships by rail. *Id.* at 435. Further, the only siding Hughes could use to load onto Southern's railroad track is owned by a competitor. *Id.* at 437–38. Another woodyard owner, Ronald Shore, testified; his testimony was similar to that of Hughes. Tr. at 453–57.[9]

---

**9.** Ronald Shores' testimony demonstrates the commendatorily thorough job some Protestants did of seeking transportation alternatives, as compared with that of the Applicant, who had

the burden to prove alternative transportation existed. For example, Shores testified:

Well I've got very little on cost. I did check—*I called all the people L & N referred to as potential truckers.* The first one on the

Despite the fact that L & N had the burden of proving the abandonment was in the public convenience or necessity, 49 U.S.C. § 10904(d)(1), and that L & N offered virtually no proof of alternative transportation, the Commission determined that alternative transportation was available. We find this incredible. Virtually every specific fact relied upon by the Commission in determining alternative transportation existed is credibly controverted, or non-existent, in the record. For example, the ICC stated that rail rates for pulpwood shippers from Copperhill, Tennessee are competitive with those on the Murphy Branch. It failed to explain, however, how the pulpwood was to get to Copperhill. The Commission said that for the stone shippers "similarly favorable rate comparisons *may be* available." This is speculative, unsupported, and provides no basis for concluding alternative transportation exists. The Commission admitted that bagged decorative stone veneer, constituting a large pro-

portion of the Murphy Branch's current traffic, cannot be transloaded. "Shippers may thus be forced to package this stone in some other manner and incur additional transportation cost." The uncontroverted testimony, however, is that alternative packaging (crates) is unacceptable to buyers, Tr. at 597–98 and the "additional" transportation costs would be prohibitive. *E.g.*, Tr. at 590, 597.[10]

▪ We are unable to accept the conclusion of the Commission that "abandonment of the Murphy Branch would not leave [the shippers] ... entirely without an alternative means of distributing their products." If the phrase "alternative" is to have any meaning it must be interpreted to include transportation both logistically and economically feasible. Not only was there not "substantial evidence" in the record to support the existence of alternative means of transport, there was virtually no evidence of such transport.[11] Accordingly, the grant

---

list was ABF and they don't handle any pulpwood, not interested, not set up for it. Second was Atlanta Motor Lines, wasn't interested at all. The next was Spartan Express, Incorporated, talked to Doug Prockett. He's only got van trucks. He said if I could get it [pulpwood] in liquid form he'd haul it. The third one was Watkins Motors Lines, he said he was strictly a general carrier, they weren't interested at all. I also called the two local people here in town and they referred me to his boss and he wasn't interested at all, involved too much money in buying trailers and Blue Ridge Trucking Company wasn't interested. The people I talked to as truck drivers, I talked to a list of about I believe I counted 8 or 9 truck drivers and truck owners.

Tr. at 453 (emphasis supplied).

The testimony of individuals at the decorative stone concerns was equally compelling as to the difficulty with trucking their products. For example, Randall Thomas Davis, Secretary of Zyrian Stone, Inc. one of the Murphy Branch's primary customers, testified that trucking was neither economically nor physically possible. Tr. at 558–62; 566–67.

**10.** The closest any testimony came to characterizing a shipment to another railhead as not "insurmountable" was that of Harold Dillard of Mineral Bluff Stone Company who said the company had considered loading at Copperhill or Blue Ridge but "it would cut the profit real—it would hurt real bad, ...." Tr. at 590. Others elaborated on how bad "real bad" might

be stating it would not be cost effective, *e.g.*, Tr. at 597.

The ICC distorted bits from the record to present a different case. For example, the opinion of the Commission suggests that trucking the stone might be economically feasible, noting that "[a]t least one shipper testified that motor transportation did not become relatively expensive until distances reached 200 miles." Tr. at 595. The key word is "relatively;" the witness went on to say "[m]ost of our stone is sold beyond that." Further, if the ultimate destination is beyond 200 miles, requiring trucking and rail transport, the transloading costs drive up the price of the stone.

**11.** In its November 22, 1982 decision the ICC relied in part on evidence in a branch line study performed by Wilbur Smith and Associates, Inc. for the Georgia Department of Transportation. That study, however, offers no evidence of alternative transportation. It merely assumes abandonment and suggests some alternates the shippers would attempt to use. Alternate transportation in the context of this proceeding must be practically available, not an alternate that may fail. The ICC's decision recognizes that the branch line study offers no certain alternatives, paraphrasing the study to the effect that pulpwood shippers "would be likely to" use trucks, and that stone shippers "would probably attempt" to transship to the Copperhill railhead.

of an abandonment certificate based on the existence of alternative transportation was arbitrary and capricious.

*Impact to Rural and Community Development*

Given the errors in the Commission's review of alternative transportation it is of little surprise that its evaluation of the impact on rural and community development is also incorrect. In this case the two items clearly are related. Uncontroverted record evidence shows that the pulpwood and decorative stone products industries are enormously important to the rural areas served by the Murphy Branch. The ALJ concluded that in the event the railroad was abandoned "[t]he pulpwood and decorative stone industries would be virtually destroyed.... [H]ere in these mountain communities they are major employers, essential sources of tax dollars. Even if these businesses were able to survive by relocating, as suggested by applicant, they would be lost to these communities." These conclusions are supported by pages of record evidence, as well as a summary of facts recorded in Appendix F to the ALJ's opinion.

Despite the conclusions of the ALJ and sufficient record evidence to raise a genuine concern, the Commission dealt with this Congressionally-mandated factor in but two paragraphs, which we set out in full:

> *Harm to shippers and local communities.* Under 49 U.S.C. 10903(a)(2), we are required to consider whether the proposed abandonment will have a serious adverse impact on rural and community development. Here, protestants allege that the termination of service on the Murphy Branch will have a devastating effect on the local stone and pulpwood industries and, concomitantly on the entire economy of an already depressed region. We agree that the loss of service

over the Murphy Branch may burden shippers with increased costs, and thereby cause some of them to close or relocate. However, this situation is not atypical of most abandonments, and inconvenience or increased costs to shippers, standing alone, do not warrant continuation of a losing operation.

Although the local communities served by the Murphy Branch may also be adversely affected by this abandonment, we cannot deny the application solely on this basis. We must weigh the harm which abandonment causes against the burden on the carrier which continued operation imposes. *Colorado v. United States, supra.* Here, any potential loss of employment will be mitigated by possible relocation of pulpwood yards and transloading of shipper's commodities at an alternate railhead. The local economy also has industries that are not rail dependent and, in any event, a portion of the area will continue to be served by L & N's other line. We conclude that on balance, the continued drain on L & N of operating the line outweighs any adverse effect on the local community which abandonment would cause.

■■■ This passage of the Commission's opinion suffers a number of fatal defects. First, the record is devoid of evidence of anything other than passing reference to "other industries that are not rail dependent." There is no testimony concerning the jobs provided by the "other industries," or the contribution of these "other industries" to the local community. This is in contrast to record evidence noted by the ALJ that the industries the Commission callously suggests will "relocate" provide essential jobs to a community whose rate of unemployment approaches twenty percent. Second, service by another L & N line is irrelevant if the affected shippers cannot use the alternative line.[12] Finally, we fail to see how

---

12. The record is replete with concern about this other L & N line. Evidently, one half of the traffic which currently moves on the "other line" originates on the Murphy Branch. The shippers and community members who testified expressed concern, therefore, that if the

Murphy Branch was abandoned, the next application filed for abandonment in the area would be for this "other line," which undoubtedly would be less profitable if the volume on its track was cut by one-half.

"possible relocation" of the pulpwood or decorative stone industries can mitigate, or have *anything* to do with the injury to *these* communities. The Commission's conclusion is inadequate under the "arbitrary and capricious" standard.

*Conclusion*

We have examined two of the four factors relevant in determining the public convenience and necessity. Although neither the cases cited nor the opinion of the Commission addresses the weight to be given each factor, the fact that the record fails to support the conclusion of the Commission on two of four relevant factors serves to undermine the decision in its entirety. Whether the substantial evidence test or the arbitrary and capricious test is used, the decision of the ICC in this case must be reversed.

REVERSED.