ALABAMA PUBLIC SERVICE COMMISSION, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

The CITY OF TUSCALOOSA, ALABAMA, et al., Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

Nos. 84–7349, 84–7358.

United States Court of Appeals, Eleventh Circuit.

July 23, 1985.

Rehearing and Rehearing En Banc Denied Aug. 27, 1985.

Stanley W. Foy, Montgomery, Ala., for Alabama Public Service Com'n.

Louis Mackall, Office of the Gen. Counsel, ICC, Washington, D.C., for I.C.C.

John J. Powers, III, George Edelstein, Dept. of Justice, Washington, D.C., for the U.S.

John W. Adams, Jr., Mobile, Ala., for Illinois Central Gulf R.R.

Rutherford Lyle Key, Jr., Jacksonville, Fla., for Seaboard System R.R., Inc.

Nancy S. Fleischman, Washington, D.C., for Central of Georgia & Southern Ry.

J.D. Fleming, Jr., John W. Bonds, Jr., Atlanta, Ga., for Union Camp Corp.

William P. Jackson, Jr., Jackson & Jessup, P.C., Arlington, Va., for The City of Tuscaloosa, Ala., et al.

Petitions for Review of an Order of the Interstate Commerce Commission.

Before KRAVITCH and HATCHETT, Circuit Judges, and WRIGHT \*, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this appeal, we review the Interstate Commerce Commission's decision that approval of a finance application, involving several railroads, which included acquisitions and abandonments, would not cause a substantial lessening of competition, a monopoly, or a restraint of trade. We affirm.

## FACTS

In July, 1982, five railroads reached agreement on a series of acquisitions and abandonments.[1] The negotiations which culminated in the filing of the three applications for approval by the Interstate Commerce Commission (ICC) were conducted under the statutory protection of section 5 of the Department of Transportation Act.[2]

---

\* Honorable Eugene A. Wright, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

1. These railroads were: The Illinois Central Gulf Railroad Company (ICG), Seaboard System Railroad, Inc. (Seaboard), its subsidiary, Western Railway of Alabama (WRA), Southern Railway Company (Southern), and its subsidiary, Central of Georgia Railroad (COG). The railroads agreed that:

 *Finance Docket 30202*
 (1) Seaboard would acquire from ICG and operate a 10-mile line of railroad from Montgomery to Autauga Creek, Alabama;
 (2) Southern would acquire from ICG and operate a 42-mile contiguous line of railroad extending from Autauga Creek to Maplesville, Alabama;
 (3) Southern would acquire trackage rights over the 10-mile line of railroad between Autauga Creek and Montgomery;
 (4) Seaboard and Southern would acquire the right to use existing joint terminal facilities at Montgomery and to participate in

that joint terminal, which is now operated by WRA;
 *Docket AB–28*
 (5) COG would abandon its 36.8-mile line of railroad extending from Union Springs, Alabama, to Montgomery;
 *Docket AB–43*
 (6) ICG would abandon its 50-mile line of railroad extending from Maplesville to Tuscaloosa, Alabama.

2. Section 5 of the Department of Transportation Act (formerly codified at 49 U.S.C.A. § 1651) was amended by Section 401 of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. 94–210, which is presently codified at 49 U.S.C.A. § 333 (Supp.1984), 96 Stat. 2429, Pub.L. 97–449, Jan. 12, 1983. As the Interstate Commerce Commission refers to the current section 333 as "section 5," that section is displayed below in accordance with its "section 5" designation.

 Section 5(b) [Section 333(b) ] provides:

Prior to the filing of the three applications, the ICC determined that Finance Docket 30202 was a "minor" transaction under 49 C.F.R. § 1180.2 [3] which provides for limitation of the amount of information that an applicant need provide and allows the ICC

to waive other informational requirements of 49 C.F.R. § 1152 (1984). *See* 49 C.F.R. §§ 1180.0, 1180.6, and 1180.8.

The ICC approved Finance Docket 30202 as a minor transaction based on 49 U.S. C.A. § 11344(d).[4] That section obligates

> (b) To achieve a more efficient, economical, and viable rail system in the private sector, the Secretary, when requested by a rail carrier and under this section, may assist in planning, negotiating, and carrying out a unification or coordination of operations and facilities of at least 2 rail carriers.
>
> Section 5(d) [Section 333(d) ] provides:
>
> (d)(1) When requested by a rail carrier, the Secretary may hold conferences on and mediate disputes resulting from a proposed unification or coordination project. The Secretary may invite to a conference—
>
>> (A) officers and directors of an affected rail carrier;
>>
>> (B) representatives of rail carrier employees who may be affected;
>>
>> (C) representatives of the Interstate Commerce Commission;
>>
>> (D) State and local government officials, shippers, and consumer representatives; and
>>
>> (E) representatives of the Federal Trade Commission and the Attorney General.
>
> (2) A person attending or represented at a conference on a proposed unification or coordination project is not liable under the antitrust laws of the United States for any discussion at the conference and for any agreements reached at the conference, that are entered into with the approval of the Secretary to achieve or determine a plan of action to carry out the unification or coordination project.

3. Title 49 C.F.R. § 1180.2 provides:

> § 1180.2 Types of transactions.
>
> Transactions proposed under 49 U.S.C. 11343 involving more than one common carrier by railroad are of four types: *Major, significant, minor,* and *exempt.*
>
> (a) A *major* transaction is a control or merger involving two or more class I railroads.
>
> (b) A *significant* transaction involves at least one Class I railroad, acting together with one or more other class I or class II railroads, in a major market extension. It is of regional or national transportation significance as defined in 49 U.S.C. 11345.
>
> (c) A *minor* transaction is one which involves more than one railroad and which is not a *major, significant,* or *exempt* transaction.
>
> (d) A transaction is *exempt* if it is within one of the six categories described below. The Commission has found that its prior review and approval of these transactions is not necessary to carry out the rail transportation policy of 49 U.S.C. 10101a; and is of limited

scope or unnecessary to protect shippers from market abuse. See 49 U.S.C. 10505. A notice must be filed to use one of these class exemptions. The procedures are set out in § 1180.-4(g). These class exemptions do not relieve a carrier of its statutory obligation to protect the interests of employees. See 49 U.S.C. 10505(g)(2) and 11347. The enumeration of the following categories of transactions as exempt does not preclude a carrier from seeking an exemption of specific transactions not falling into these categories.

> (1) Acquisition of a line of railroad which would not constitute a major market extension where the Commission has found that the public convenience and necessity permit abandonment.
>
> (2) Acquisition of a nonconnecting carrier or one of its lines where (i) the railroads would not connect with each other or any railroads in their corporate family, (ii) the acquisition is not part of a series of anticipated transactions that would connect the railroads with each other or any railroad in their corporate family, and (iii) the transaction does not involve a class I carrier.
>
> (3) Transactions within a corporate family that do not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family.
>
> (4) Renewal of leases or trackage rights contracts and any other matters where the Commission has previously authorized the transaction, and only an extension of time is involved.
>
> (5) Joint projects involving the relocation of a line of railroad which does not disrupt service to shippers.
>
> (6) Reincorporation in a different State.

4. Title 49 U.S.C.A. § 11344(d) provides in relevant part:

> (d) In a proceeding under this section which does not involve the merger or control of at least two class I railroads, as defined by the Commission, the Commission shall approve such an application unless it finds that—
>
>> (1) as a result of the transaction, there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and
>>
>> (2) the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs.

the ICC to approve the application unless there is a finding that the transaction is likely to substantially lessen competition, create a monopoly, or otherwise restrain trade and freight service transportation. If anticompetitive effects are both likely and substantial, the ICC must balance those effects against the public interest in satisfying significant transportation needs.

Dockets AB–28 and AB–43 were approved based on a finding that the abandonments are required by public convenience and necessity. 49 U.S.C.A. §§ 10903(a), 10904(d).[5] The additional requirement under the public convenience and necessity test of 49 U.S.C.A. § 10904(d)(2) (detriment not to exceed the benefit of the abandonment), was not ap-

plied by the ICC because the Secretary of Transportation neither approved nor disapproved the agreements.[6]

Petitioners appeal the ICC's (1) granting of authority to finalize purchase, trackage rights, and Montgomery terminal agreements (Finance Docket 30202) pursuant to 49 U.S.C.A. §§ 11343–11345 (1984), 49 C.F.R. §§ 1180.0–1180.26 (1984); (2) granting of certificate of public convenience for the Union Springs-Montgomery, Alabama, abandonment (Docket AB–28, sub-5) pursuant to 49 U.S.C.A. § 10903 (Supp.1984)[7]; and (3) granting of certificate of public convenience for the Tuscaloosa-Maplesville, Alabama, abandonment (Docket AB–43, sub-101) pursuant to 49 U.S.C.A. § 10903.

---

**5.** Title 49 U.S.C.A. § 10903(a) provides:

(a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may—

(1) abandon any part of its railroad lines; or

(2) discontinue the operation of all rail transportation over any part of its railroad lines;

only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance. In making the finding, the Commission shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development.

Title 49 U.S.C.A. § 10904(d) provides:

(d)(1) The burden is on the person applying for the certificate to prove that the present or future public convenience and necessity require or permit the abandonment or discontinuance.

(2) For applications approved by the Secretary of Transportation as part of a plan or proposal under section 5(a)–(d) of the Department of Transportation Act (49 U.S.C. 1654(a)–(d)), the Commission shall consider whether any detriment from the abandonment or discontinuance exceeds the transportation benefit from the plan or proposal as a whole.

**6.** Also because the Secretary did not approve the proposed changes, the antitrust immunity afforded during the negotiations no longer exists. As a result, the ICC's consideration of substantial adverse competitive effects, under section 11344(d) entails, if necessary, assessment of antitrust implications. *See* section 5(d) (49 U.S. C.A. § 333(d)), *supra*.

**7.** Title 49 U.S.C.A. § 10903 provides:

Authorizing abandonment and discontinuance of railroad lines and rail transportation

(a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may—

(1) abandon any part of its railroad lines; or

(2) discontinue the operation of all rail transportation over any part of its railroad lines;

only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance. In making the finding, the Commission shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development.

(b)(1) Subject to sections 10904–10906 of this title, if the Commission—

(A) finds public convenience and necessity, it shall—

(i) approve the application as filed; or

(ii) approve the application with modifications and require compliance with conditions that the Commission finds are required by public convenience and necessity; or

(B) fails to find public convenience and necessity, it shall deny the application.

(2) On approval, the Commission shall issue to the rail carrier a certificate describing the abandonment or discontinuance approved by the Commission. Each certificate shall also contain provisions to protect the interests of employees. The provisions shall be at least as beneficial to those interests as the provisions established under section 11347 of this title and section 565(b) of title 45.

## STATUTORY CRITERIA AND STANDARD OF REVIEW

This circuit has previously discussed the requirements of the public convenience and necessity test. In *Georgia Public Service Commission v. United States*, 704 F.2d 538, 541 (11th Cir.1983), we held that:

[A] finding of public convenience or [sic] necessity involves balancing competing interests: '[t]he benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce.' *Colorado v. United States*, 271 U.S. 153, 168, 46 S.Ct. 452, 456, 70 L.Ed. 878, 885 (1926). *E.g., State of Texas v. United States*, 642 F.2d 87, 90 (5th Cir. 1981); *State of Nebraska v. United States*, 255 F.Supp. 718, 721 (D.Neb. 1966). As we stated in *State of Texas v. United States*, 642 F.2d at 90:

The Commission's role in abandonment proceedings is to balance the immediate and local interests of the community and the shippers against the broader public interest in freeing interstate commerce from undue burdens. The ICC must consider whether the branch line is profitable or whether it imposes a drain on other income, as well as the likely expense of continued operation,
....

(citation omitted). Balancing requires the ICC to take into account a number of relevant factors, including the profitability of the line and the expense of continued operation, *Purcell v. United States*, 315 U.S. 381, 384, 62 S.Ct. 709, 710, 86 L.Ed. 910, 914 (1942), the likelihood of the line's future profitability, *People of the State of Illinois v. United States*, 666 F.2d 1066, 1079 (7th Cir.1981); *State of Texas*, 642 F.2d at 89, the availability of alternative transportation, *People of the State of Illinois*, 666 F.2d at 1080; *State of Texas*, 642 F.2d at 89, and the congressionally mandated examination of the harm to rural communities. 49 U.S.C. § 10903(a). [Footnote omitted.]

■ The standard of appellate review of an ICC decision is very narrow. *Bloomer Shippers Association v. ICC*, 679 F.2d 668 (7th Cir.1982). The scope of our review is directed only at the conclusion of the ICC. *State of Texas v. United States*, 642 F.2d 87, 89 (5th Cir.1981). "We may only overturn the decision if it is unsupported by substantial evidence, 5 U.S.C. § 706(2)(E), or if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Georgia Public Service Commission*, 704 F.2d at 542. "Substantial evidence" is relevant evidence acceptable by a reasonable mind as supporting a conclusion. *Refrigerated Transport Company, Inc. v. ICC*, 616 F.2d 748, 751 (5th Cir.1980). "It is something more than a scintilla of evidence, but something less than the weight of the evidence." *McHenry v. Bond*, 668 F.2d 1185, 1190 (11th Cir. 1982). If there is substantial evidence in the record, it is beyond the appellate court's function to "substitute its own conclusions for those which the Commission had fairly drawn from such findings." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). Under the arbitrary and capricious standard, "all the agency must do is articulate a rational connection between the facts and its conclusion." *Georgia Public Service Commission*, 704 F.2d at 543. *See Bowman Transportation, Inc.*, 419 U.S. at 285, 95 S.Ct. at 441. Once the ICC has drawn its conclusion, an appellate court must give deference to the expertise of the agency. *Georgia Public Service Commission*, 704 F.2d at 543; *People of State of Illinois v. ICC*, 698 F.2d 868, 871 (7th Cir.1983).

## *Finance Docket 30202:* Purchase, Trackage Rights and Montgomery Terminal Agreements

Alabama Public Service Commission and the other petitioners contend that the anticompetitive effects of Finance Docket 30202 and of the other dockets outweigh the public interest in meeting significant transportation needs. Petitioners find an abuse of discretion and lack of substantial evidence in (1) the failure of the ICC while

considering the anticompetitive effects of Finance Docket 30202, to evaluate the anticompetitive effects of the overall plan (those agreements specified and implicated under the other dockets before the ICC); (2) the purported error of the ICC in restricting the geographic market area for consideration of anticompetitive effects to the Montgomery-Maplesville corridor and not considering the entire region covered by all the dockets; and (3) in its classifying Finance Docket 30202 as a "minor" transaction which also prevented Robert Serlin from presenting his plan for operation of the entire Tuscaloosa to Montgomery segment of the ICG line.[8]

 Petitioners' contentions are without merit. First, mindful of our limited scope of review, we find that the ICC's decision to consider the applications individually, even while evaluating the existence of anticompetitive effects, was not an abuse of discretion. If the Department of Transportation (DOT) had approved the plans which were before the ICC as individual applications, then the ICC would have been required by 49 U.S.C. § 10904(d)(2) to consider whether the detriment caused by the proposed abandonments exceeded the benefits of the "proposal as a whole." Because the Secretary of Transportation chose not to approve the coordinated plan, the ICC was not bound by the section 10904(d)(2) standard. Without the approval of the Secretary of Transportation as to the proposed agreement as a whole, it was not an abuse of discretion for the ICC to decline to consider the overall benefits of all the agreements while determining whether to grant the certificates of public convenience and necessity for the abandonments. *See Louisville and Nashville Railroad Co. —Abandonment,* 366 I.C.C. 1, 9 (1981). Second, it is not for the court of appeals to disturb the ICC's definition of the geographic and product markets for purposes of an anticompetitive effect evaluation based on the bare allegations of petitioners that a more broad definition is appropriate. Third, the determination of what filing requirements are appropriate for the application is totally within the expertise and discretion of the ICC. Petitioners have not shown that the ICC's classification is based on less than a scintilla of evidence or has no rational connection to the facts.

### *Docket AB–28 and AB–43:* The Abandonments.

Petitioners contend that the ICC erred in waiving submission of overhead traffic data: traffic moving over the line for which a fee is paid. Petitioners argue that this waiver effectively conceals $6 million of lost revenue as the result of the abandonment.

 The test for determining whether the ICC has abused its discretion in waiving the filing of overhead traffic data is whether the traffic can be rerouted efficiently. *People of State of Illinois v. ICC,*

---

**8.** Petitioners also contend that Southern has agreed with Seaboard not to establish a TOFC (piggyback) facility in Montgomery, "not to establish a through route from Union Springs via Autauga Creek to Maplesville, to leave Seaboard with a 6–1 advantage on routes to Montgomery, and to restrict itself to serving Montgomery only over tracks owned and controlled by Seaboard. This also means Southern is leaving the market between Montgomery and southeast Alabama to Seaboard.... Consequently, the Seaboard would have monopoly pricing opportunities in the city of Montgomery and the Southern would have monopoly pricing opportunities in Tuscaloosa under the proposed plan."

We find that Southern's agreement not to establish a TOFC facility in Montgomery was not sufficient evidence of anticompetitive effect so as to make the ICC's decision an abuse of discretion and lacking in substantial evidence. In evaluating the finance transaction, the ICC balanced the pluses and minuses involved in the particular terms of the agreement. It found:

Southern will acquire a more efficient route into Montgomery for most traffic while retaining access to all the Montgomery shippers presently served by Central. *The restrictions on Southern's service between Autauga Creek and Montgomery and in Montgomery proper will not change the status quo. On the other hand, the agreements significantly enhance Southern's ability to serve the area's major shipper. Direct access to Union Camp will allow Southern to avoid paying switching charges and will provide a shorter route to its mainline at Maplesville.* The creation of its own agency station at Autauga Creek will also help improve service to Montgomery area shippers. [Emphasis added.]

698 F.2d 868, 873 (7th Cir.1983). The ICC found that traffic could be rerouted efficiently and "[s]ince the ICC accords little weight to bridge traffic revenues and since bridge traffic routing is a matter of managerial discretion, we do not believe that discovery of the bridge traffic revenue would have altered the determination of the ICC in this instance." *People of State of Illinois,* 698 F.2d at 873. As a result, therefore, no abuse of discretion can be found in the failure to require provision of overhead traffic data.

▆▆▆ Petitioners also contend that the ICC erred in failing to perceive a serious adverse impact on rural and community development because of the abandonments. The ICC found that with the exception of two shippers, motor transportation was sufficient to support the needs of the other shippers in the Union Springs-Montgomery area, and regarding the Tuscaloosa-Maplesville abandonment. The ICC found that "only four shippers will actually lose rail service" while a major shipper, Union Camp, will be provided more efficient service. We agree with the ICC that "while shippers are likely to incur inconvenience and increased costs as a result of a rail line abandonment, these factors are not sufficient to offset the detriment to the public interest of continued operation of uneconomic and excess facilities. *Chicago and Northwestern Transportation Co.—Abandonment,* 354 I.C.C. 1, 7 (1977)."

Petitioners also argue that the ICC erred in its consideration of the availability of alternative transportation. They argue that this case is similar to the facts of *Georgia Public Service Commission v. United States,* 704 F.2d 538 (11th Cir.1983). In *Georgia Public Service Commission,* the only record evidence to support the ICC's determination that alternative services were available, was the testimony of one railroad employee which did not verify the actual ability of alternative carriers to provide service, the proximity of major highways, nor the general logistics of transporting the goods to the carriers.

▆▆▆ The ICC's determination in this case does not demonstrate a total lack of foundation, as found in *Georgia Public Service,* requiring a finding of abuse of discretion or lack of substantial evidence. The ICC found that "[a]lthough numerous parties protested the proposed abandonment, only four shippers will actually lose rail service. The largest shipper, Union Camp, did not oppose the abandonment. The record shows, moreover, that all the protesting shippers have used motor service, some for a significant percentage of their transportation needs." The adequacy of alternative transportation is only one factor within the balancing required by the public convenience and necessity test. *Colorado v. United States,* 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878 (1926); *Georgia Public Service,* 704 F.2d at 543. The inadequacy of alternative transportation as to some shippers does not require a finding and decision that alternative transportation services are inadequate as a whole, nor that the certificate of public convenience ought not be granted. "The benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce." *Georgia Public Service,* 704 F.2d at 541 (quoting *Colorado v. United States,* 271 U.S. 153, 168, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1926)). It was not error, therefore, for the ICC to conclude that alternative transportation services are adequate.

*Impartial Hearing Officer.*

Petitioners contend that they were denied a fair hearing because ICC Commissioner Gradison was partial to the interests of the railroads. As evidence of partiality, they point to the fact that Commissioner Gradison was an employee of Southern during the time the negotiations which produced Finance Docket 30202 were taking place. While conceding that the Commissioner was not directly involved in those negotiations, petitioners assert that Commissioner Gradison was "friendly with other Southern employees who were so involved."

**1524**

██ Petitioners argue for a rule which would invalidate the vast majority of administrative proceedings where hearing officers had transferred from the private to public sector or vice versa. As the former Fifth Circuit held in *Parrish v. Board of Commissioners of the Alabama State Bar*, 524 F.2d 98, 104 (5th Cir.1975): "The allegation of lack of impartiality stemming from ... acquaintanceship or friendship with witnesses and defense counsel is ... tenuous. It does not exceed what might be expected as background or associational activities with respect to the usual" ICC commissioner. It is understood and expected that the expertise and experience gained through employment in a regulated industry can be of substantial benefit when subsequently employed with the regulator administrative agency. This connection, and a reasonable familiarity of persons and process, is not a per se violation of procedural due process. On the bare allegations that petitioners put forth we do not believe that Commissioner Gradison lacked impartiality.

Petitioners also contend that the ICC abused its discretion in failing to impose conditions on the abandonment and in not accepting the Serlin proposal to purchase the Tuscaloosa to Montgomery line. The ICC was well within its discretion in imposing the conditions that it imposed, and further, the Serlin proposal was not properly before the ICC.

### CONCLUSION

We hold, therefore, that the ICC's decision to grant authority for Finance Docket 30202 and to grant the certificates of public convenience and necessity in Dockets AB–28 and AB–43 was based on substantial evidence and was not an abuse of discretion nor arbitrary and capricious.

### AFFIRMED