**PEOPLE OF the STATE OF ILLINOIS and Bi-Petro Refining Company, Inc., et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

Nos. 81–2520, 81–2540.

United States Court of Appeals, Seventh Circuit.

Argued April 5, 1982.

Decided Jan. 24, 1983.

Rehearing Denied Feb. 18, 1983.

Gordon P. MacDougall, Washington, D.C., Robert F. Jarka, Pfeifer & Kelty, P.C., Springfield, Ill., James E. Weging, Asst. Atty. Gen., State of Ill., Chicago, Ill., for petitioners.

Daniel B. Harrell, I.C.C., Washington, D.C., Richard M. Kamowski, Ill. Central Gulf Railroad Co., Chicago, Ill., for respondents.

Before CUMMINGS, Chief Judge, PELL, Circuit Judge and GRANT,* Senior District Judge.

GRANT, Senior District Judge.

This is an appeal from the decision of the Interstate Commerce Commission (herein-after ICC) abandoning a rail line which extends for 76 miles between Assumption and Branch Junction, Illinois. Petitioners, the State of Illinois, the Illinois Commerce Commission, New Green Soil Service, Inc., Harbach, Nixon and Willson, Inc., Patrick Simmons, and Bi-Petro Refining Company, Inc., raise three issues on appeal:

1. Whether the ICC properly handled administrative appeals from the Review Board decision granting the abandonment application of the Illinois Central Gulf Railroad (hereinafter I.C.G.);

2. Whether the ICC's refusal to allow discovery of certain bridge traffic information constitutes reversible error;

3. Whether the material findings of the ICC are arbitrary and capricious?

### Facts

I.C.G. railroad operates a line which extends through south central Illinois. On June 11, 1980, the I.C.G. filed an application to abandon this rail line. The ICC rejected the initial abandonment application because I.C.G. failed to include data concerning bridge or overhead traffic pursuant to rail line abandonment regulations 49 C.F.R. §§ 1121.32(c)(5) and (d) (1981). I.C.G. subsequently successfully petitioned the ICC to waive the requirement of bridge traffic information.

The ICC referred the abandonment application without the bridge traffic information to a Review Board under the Agency's modified procedure. After examination of the exhibits, verified statements and arguments, the Review Board granted I.C.G.'s abandonment application. In its decision, the Review Board determined that the rail line had experienced avoidable losses of $329,928 in 1978 and $239,676 in 1979. Losses for the base year (October 1, 1979 through September 30, 1980) were lower, $47,635 and for the first nine months of 1980, the line showed a marginal profit of $1,340. The Review Board determined, however, that this decrease in operating

---

* Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

losses in 1979 and 1980 was partly due to the deferral of maintenance on the line by I.C.G. Additionally, the Review Board determined that the line needed extensive rehabilitation because of the deferred maintenance and that I.C.G. would have to earn $455,597 to avoid incurring an opportunity cost by having valuable assets tied up in nonproductive use.

The Review Board balanced the burden the rail line imposed upon interstate commerce against the harm to and need of the affected communities and shippers. While abandonment would cause some financial loss and inconvenience to the shippers, such loss did not justify continued operation of an unprofitable line. Alternate transportation was available and being used. The abandonment would have little or no impact upon rural and community development and would have no significant environmental or energy effects. The Review Board determined that the need for the line did not outweigh the burden continued operation of the line would impose upon I.C.G. and interstate commerce.

On August 17th and 18th, 1981, petitioners Growmark, Inc., the People of the State of Illinois, the Illinois Commerce Commission and Patrick Simmons filed appeals to the ICC from the Review Board decision granting the abandonment. On August 28, 1981, the ICC determined that it would not hear the appeals and summarily affirmed the Review Board's determinations. Petitioners bring this action to review the ICC's determinations.

## I.

"The scope of review of ICC orders is very narrow." *Bloomer Shippers Association v. I.C.C.,* 679 F.2d 668, 672 (7th Cir.1982). The determinations of the ICC will be upheld if they are supported by substantial evidence and are not arbitrary or capricious. 5 U.S.C. §§ 706(2)(A), (E) (1976); *Farmland Industries, Inc. v. United States,* 642 F.2d 208, 210 (7th Cir.1981). Where there is substantial support in the record for the Commission's findings, it is not the court's function "to substitute its

own conclusions for those which the Commission had fairly drawn from such findings." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Illinois Central Railroad Co. v. Norfolk and Western Railway Co.,* 385 U.S. 57, 69, 87 S.Ct. 255, 262, 17 L.Ed.2d 162 (1966).

In a railway abandonment proceeding, the ICC determines whether abandonment is consistent with "public convenience and necessity." 49 U.S.C.A. § 10903(a) (Supp.1982), *Farmland Industries, Inc.,* 642 F.2d at 210. The ICC traditionally applies a balancing test to weigh "the interests of those now served by the present line on the one hand and the interests of the carrier and the transportation system on the other." *Chicago and Northwestern Transportation Co. v. Kalo Brick and Tile Co.,* 450 U.S. 311, 321, 101 S.Ct. 1124, 1132, 67 L.Ed.2d 258 (1981), citing *Purcell v. United States,* 315 U.S. 381, 384, 62 S.Ct. 709, 710, 86 L.Ed. 910 (1942). Once the Commission has struck that balance, its conclusion is entitled to considerable deference. 315 U.S. at 385, 62 S.Ct. at 711. An ICC decision will not be reversed on review if there is a "rational connection between the facts found and the choice made." *Bowman Transportation, Inc.,* 419 U.S. at 285, 95 S.Ct. at 441, citing *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

## II. Administrative Appeals

On August 17 and 18, 1981, petitioners filed appeals to the ICC seeking review of the Review Board's determination granting I.C.G.'s abandonment application. At the time I.C.G. filed its abandonment application, a federal statute (49 U.S.C.A. § 10327(f)(1) (Supp.1982)) mandated that the ICC review the determination of the Review Board. Shortly thereafter and while the abandonment application was pending, the Staggers Act (Public L. No. 96–448, 94 Stat. 1895 (1980)) became effec-

tive making review before the ICC discretionary, not mandatory. Petitioners allege that the ICC utilized "pre-Staggers Act" law during the majority of the case but have used the new "discretionary review provisions" of the Staggers Act to deny them administrative review of the Review Board decision.

■ We note that an appellate court must apply the law in effect at the time it renders its decision unless such application would work a manifest injustice or there is statutory direction or legislative history to the contrary. *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). The Conference Report indicates that Congress intended that the rule of *Bradley* apply, *see generally* H.R.Con.Rep. No. 96–1430, 96th Cong., 2d Sess. 142 (1980) reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 4174, and petitioners have failed to demonstrate they would suffer manifest injustice even if the Staggers Act did apply. However, we need not discuss the applicability of the Staggers Act since we determine that petitioners received an adequate review under 49 U.S.C.A. 10327(f)(1) (Supp.1982). (pre-Staggers Act).

■ Petitioners' argument is, in fact, that the ICC review of the Review Board determination was too cursory for their satisfaction. However, the pertinent federal statute provides:

An initial decision may be *reviewed* on the record on which it is based or by a further hearing....

49 U.S.C.A. § 10327(f)(2) (Supp.1982). (Emphasis added).

Here, the ICC determined that a review on the record was sufficient; there was no need for a further hearing. The ICC decision recites the issues raised in the appeals and its determination that the Review Board correctly rejected the claims.

In *Trailways of New England, Inc. v. United States,* 235 F.Supp. 509 (D.D.C. 1964), the District Court held that when the ICC sits in an appellate capacity, it is not required to paraphrase or restate a Review Board report. In *Trailways,* as in this case,

the ICC sufficiently informed the plaintiffs as to the basis for their determinations. The ICC simply adopted the quite adequate determinations of the Review Board as its own.

"The formulation of the procedures of an administrative agency [is] basically to be left within the discretion of the agencies to which Congress has confided the responsibility for substantive judgments." *Vermont Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978). A court of appeals will not graft its "own notions of proper procedures upon agencies entrusted with substantive functions by Congress." *Id.* at 525, 98 S.Ct. at 1202. We find, therefore, that petitioners received an adequate review within the meaning of 49 U.S.C.A. § 10327.

### III. Discovery

On August 5, 1980, the ICC waived the requirement that I.C.G. submit bridge traffic information with its abandonment application despite the vigorous objections of the petitioners. Petitioners thereupon sought discovery of the bridge traffic information, but the ICC denied discovery. Petitioners argue that the ICC erred in denying discovery of the bridge traffic information and we agree.

General rule of Practice 55 of the ICC provides:

Unless otherwise available under the Interstate Commerce Act or other applicable statutes, parties may obtain discovery pursuant to these rules ... regarding any matter not privileged which is relevant to the subject matter involved in the pending proceeding ...

49 C.F.R. § 1100.55 (1981).

General rule of Practice 2 provides:

The rules in this part shall be liberally construed to secure just, speedy and inexpensive determination of the issues presented.

49 C.F.R. § 1100.2 (1981).

Bridge traffic information is clearly relevant to the I.C.G. abandonment application. The I.C.G. included bridge traffic expenses

in its calculation of the loss the rail line experienced, but I.C.G. did not include any revenue attributable to the rail line from the bridge traffic. Under this type of formula, the rail line could only sustain a loss.

 Bridge traffic revenue is a factor in determining a line's earning capacity, *Baltimore and Ohio Railroad Co. Abandonment,* 354 I.C.C. 240, 244 (1977). The matter of a line's bridge traffic is necessary for a complete record in a rail line abandonment case, *Chicago, Burlington & Quincy Railroad Abandonment,* 267 I.C.C. 38, 47 (1946). The Agency's own regulations provide that bridge traffic data and revenue are to be included in the abandonment application (42 C.F.R. § 1121.32(c)(5), (d) (1981)). Since exclusion of revenue due to the bridge traffic can only cause the rail line to show a loss, we find the ICC's denial of discovery to be arbitrary and capricious.

Because bridge traffic data is clearly relevant in an abandonment application, we must consider whether the exclusion of such data constitutes reversible error. Our research reveals the ICC does not require allocation of bridge traffic revenues to the line sought to be abandoned where such revenues will be substantially retained by the handling of overhead traffic by the abandoning carrier over an alternate route. *Chicago and Northwestern Railway Co. Trackage Rights,* 317 I.C.C. 350, 354 (1962).

The ICC has consistently affirmed:

In abandonment proceedings involving overhead traffic, the Commission has long recognized that, while revenue derived from overhead traffic is a factor in determining a line's earning capacity, local shippers who are unable to support a railroad cannot demand continued rail transportation simply because the branch is used for movement of through traffic which could be handled as expeditiously over other routes. *See Chicago, M., St. P. & P.R. Co. Trustees Abandonment,* 240 I.C.C. 763, 767 (1940). This policy reflects the well-established principle that the routing of overhead traffic and the selection of alternate routes for the handling of such traffic is a matter of managerial discretion. *See Southern Pac. Co. Abandonment,* 317 I.C.C. 489, 493 (1962).

*Baltimore Ohio Railroad Co. Abandonment,* 354 I.C.C. at 244 (1978).

Since the ICC accords little weight to bridge traffic revenues and since bridge traffic routing is a matter of managerial discretion, we do not believe that discovery of the bridge traffic revenue would have altered the determination of the ICC in this instance. The record before the Review Board contained financial information for approximately two years when there was no bridge traffic. The Review Board properly determined, therefore, that even without bridge traffic, the rail line experienced huge losses. The bridge traffic information was discoverable, but would not have changed the outcome of this abandonment application.

IV. Economic Analysis

 Petitioners attack the determinations of the ICC on a variety of grounds which we will discuss individually.

Petitioners argue that the ICC should have held a full hearing to determine the efficiency of bridge traffic on the now abandoned rail line assuming the defunct bridge line was repaired. Petitioners argue that the rerouting of the bridge traffic is inefficient because the traffic must now travel 143.3 miles or 164.3 miles instead of 117 miles.

I.C.G. submitted detailed affidavits to the Review Board demonstrating that substantial maintenance ($318,853) and rehabilitation ($897,040) would be necessary before the line could be used for bridge traffic. Petitioners fail to explain how the now-abandoned rail line, in light of the high maintenance and rehabilitation costs, will be more effective than the present bridge traffic routes. They simply make allegations which they fail to support in the record. The decision to reroute the bridge traffic was based upon a consideration of the relevant factors, including maintenance and rehabilitation costs, and does not constitute a clear error of judgment.

Further, the selection of alternate routes for bridge traffic is a matter of managerial discretion *Baltimore and Ohio R. Co. Abandonment,* 354 I.C.C. at 244 (1978). "Public convenience and necessity [do not] require or ... a sound transportation program [does not] permit the enforced movement of bridge traffic over a particular line when such traffic can be as efficiently and economically handled over an alternate route." *Southern Pacific Company Abandonment,* 317 I.C.C. 489, 493 (1962). Since the routing of bridge traffic is a matter of managerial discretion, and is supported by the maintenance and rehabilitation costs in the record, we affirm the rerouting of the bridge traffic.

### Rehabilitation Expense

I.C.G. submitted detailed affidavits to the Review Board indicating that rehabilitation costs to restore the rail line to Federal Railroad Administration (F.R.A.) Class I track standards would be approximately $897,040. The maximum speed allowable over track which meets F.R.A. Class I track standards is 10 mph. Rehabilitation expense is the cost of maintenance and repair work which must be performed to restore a rail line to minimum operating safety condition. Petitioners argue that little, if any, rehabilitation is necessary upon the rail line. Until April 22, 1979, the rail line operated at 35 mph. The rail line currently operates at 10 mph. Because the rail line is currently operating at F.R.A. Class I standards, petitioners claim there is no need for rehabilitation.

However, the operation of a rail line at F.R.A. Class I standards prior to its discontinuance does not preclude the need for rehabilitation, or the consideration of rehabilitation costs in an abandonment application. *International Minerals and Chemical Corp. v. I.C.C.,* 656 F.2d 251, 258 (7th Cir. 1981). Rehabilitation of the rail line may be necessary to insure safe operation in the future, particularly where maintenance of the rail line has been deferred in the past. *Id.*

I.C.G.'s affidavits indicate that $897,040 is necessary to rehabilitate this line to F.R.A. Class I standards. The petitioners fail to produce any evidence that such rehabilitation costs are not necessary other than unsupported allegations. Considering the deferral of maintenance and the evidence submitted by the parties, the ICC properly accepted I.C.G.'s calculation of rehabilitation expenses.

### Normalized Maintenance Costs

Petitioners additionally attack the Review Board's use of normalized maintenance costs in determining the unprofitability of the rail line. The ICC calculates maintenance costs in two ways: actual maintenance costs and normalized maintenance costs. Actual maintenance costs are the actual expenditures incurred in maintaining a rail line during the course of a particular year. When maintenance is deferred on a rail line (as in the present instance) the maintenance expenditures will simply reflect the minimum maintenance costs which were necessary for safe, short-term operation. This circuit indicated in *International Minerals,* 656 F.2d at 257, that when a rail line defers maintenance costs on a line to curtail its operating losses, historic financial results may not accurately reflect the line's unprofitability.

Normalized maintenance costs, by comparison, represent the average annual cost of continuing economic and efficient rail operations on a long term basis. 656 F.2d at 256–57. The Commission compares actual expenditures to projected normalized maintenance figures to determine whether in the absence of deferred maintenance, the rail line would have experienced a loss. *Chicago and North Western Transportation Co. Abandonment,* 348 I.C.C. 708, 713 (1976).

Petitioners argue that the Review Board's use of normalized maintenance figures misrepresents the actual costs incurred by I.C.G. They suggest that the figures which should have been used were the actual maintenance costs incurred by I.C.G. Finally, petitioners argue that the rail line under prudent management would need lit-

tle or no maintenance costs in the future. We disagree.

The I.C.G. submitted a detailed explanation documenting why its future maintenance costs would approximate $319,000 per year. Petitioners failed to submit any evidence showing the contrary. It is absurd to expect 76 miles of rail line to require little or no maintenance, particularly after two years of deferred maintenance. The ICC properly determined that future maintenance costs of the rail line would approach $319,000 per year.

### Opportunity Costs

Opportunity costs measure the costs a railroad experiences by foregoing more profitable use of its resources. *International Minerals*, 656 F.2d at 259. The consideration of opportunity costs as a factor in abandonment cases is clearly within the statutory authority of the ICC. *Farmland Industries, Inc.*, 642 F.2d at 211. The impact of opportunity costs on interstate commerce should be taken into consideration in rail line abandonment proceedings. *Missouri Pacific Railroad Company v. United States*, 625 F.2d 178, 180 (8th Cir.1980).

Petitioners argue that the Review Board utilized the concept of opportunity costs to make a profitable line appear unprofitable. They assert that the use of opportunity costs with respect to this abandonment application is arbitrary and capricious. The opportunity cost calculation utilizes a 9.3% after-tax rate of return. The 9.3% rate of return is based upon a variety of factors, including a 46% effective tax rate. Since the railroad pays no income taxes, petitioners argue, the opportunity cost as calculated by I.C.G. is grossly exaggerated. Petitioners argue that it was unfair for the rail line to utilize a rate of return which exceeded the carrier's actual rate of return. However, case law upholds the validity of a 9.3% rate of return in the calculation of opportunity costs. *See Texas & Pacific Railway Abandonment*, 363 I.C.C. 666, 675 (1980), *Illinois Central Gulf Railroad Abandonment*, 363 I.C.C. 729, 733 (1980); *aff'd sub nom. Ballard County Rail Users v. I.C.C.*, 665 F.2d 1043 (6th Cir.1981).

In *Illinois Central Gulf Railroad,* the ICC specifically addressed the issue of whether the rate of return should be reduced because I.C.G. pays no taxes:

This argument, however, is not consistent with the concept of opportunity cost. ICG would have many of the same investment opportunities that other carriers would have, and could expect to obtain the same level of pretax income from such opportunities. We cannot reasonably assume that ICG will be less successful in its search for alternative investments than more profitable carriers. The available pretax return to ICG or a more profitable carrier would be the same. Thus, the pretax opportunity cost would be the same regardless of the fact that ICG does not pay taxes and the more profitable carrier does.

Moreover, an adjustment for non-payment of taxes would discriminate against less successful carriers and in favor of more successful ones. It would mean that a near bankrupt carrier would find it more difficult to abandon its line—because its opportunity cost would be deemed lower—than a financially healthy carrier. (This result, which seems contrary to rational abandonment policy, could of course be mitigated by the fact that opportunity cost is only one of the factors to be considered an [sic] abandonment proceedings.)

Another reason for refusing to decrease the cost of capital for carriers which do not pay taxes is that it grossly undervalues an asset in those carriers hands. The rail assets of the ICG could very readily be used on another rail line to recover a pretax cost of capital of 9.3 percent. Thus the rate of return any firm should receive from using that asset is 9.3 percent. Opportunity costs reflect the return available from an asset if it were put to an alternative use ...

363 I.C.C. 733–34.

Since we must accept the determinations of the ICC if they are supported by substantial evidence, and not arbitrary or capricious,

*Farmland Industries, Inc.,* 642 F.2d at 210, we affirm the ICC determination on opportunity costs.

### Labor Costs

 Petitioners argue that certain labor costs incurred by I.C.G. are not avoidable upon the abandonment of this rail line. The Review Board found that the labor costs were avoidable, however, and the ICC affirmed the Review Board determination.

The pertinent federal regulations define avoidable costs as:

... all expenses that would be incurred by a rail carrier in providing transportation that would not be incurred if the railroad line over which the transportation was provided were abandoned or if the transportation were discontinued.

49 U.S.C. § 10905(a)(1) (Supp.1982).

Price and Berardino note:

*The avoidable cost of a service is the present value of all savings in current and future cash outlays that would be realized by the supplier if he were to discontinue that service.* That is, if continuation of the service obligates him to an outlay of $100 next year and $200 the following year, while if he were no longer to provide it he would be left to pay only $25 a year because of contracted arrangements the avoidable cost is $100 – $25 = $75 discounted for one year, plus $200 – $25 = $175 discounted for two years. Note that this figure will normally include at least some portion of common cost; e.g., if at the reduced scale of its overall operations the firm requires only 60 instead of 100 maintenance men (who each in fact now serve several company activities), then 40 maintenance men constitute an avoidable cost.

[A]voidable costs include appropriate capital outlays if the service in question requires investment in a new machine next year, then presumably the cost of that investment will be avoided if the service is discontinued.

Price and Berardino, Defining Economic Terms Used in the Railroad Revitalization and Regulatory Reform Act, 9 Transp.L.J. 133, 154 (1977). (Emphasis in original).

This Court recently addressed the avoidability of labor costs in *International Minerals,* 656 F.2d at 254. "There remains a venerable line of cases where the ICC has deemed labor expenses avoidable where circumstances indicate that employees may be shifted to other productive services upon abandonment." *Id.* at 257. Here, two factors indicate that labor costs are avoidable. The I.C.G. abandonment petition involved only 76 miles of a 119-mile track. Even if the I.C.G. were required to maintain a crew for the abandoned section, work would remain on the rest of the line which the crew could perform. Retention of the train crew would further reduce I.C.G.'s labor cost because the reassignment of the employees would reduce I.C.G.'s training and hiring of new employees. *International Minerals,* 652 F.2d at 257.

Even assuming, *arguendo,* that labor costs are not avoidable, the Review Board found that the rail line needed $897,040 to bring the rail line into compliance with F.R.A. Class I operating standards, and annual maintenance of $318,853. These figures far exceed the non-avoidable labor costs, and justify the abandonment of the rail line, regardless of labor costs.

"The decision of whether or not employee transfers in fact will result in savings to the railroad is one for the ICC, not this court. We see no reason to disturb the ICC's conclusion in this case...." *International Minerals,* 656 F.2d at 254.

### Conclusion

We AFFIRM the determinations of the ICC as not arbitrary and capricious, and as supported by substantial evidence.