727 F.2d 748
 77 A.L.R.Fed. 221
 CITY OF CHEROKEE, Farmers CO-OP (Larrabee, Iowa), Farmer's
CO-OP George Iowa, Calumet Feed Service, Rowena Elevator &
Mill, Metz Baking Company, Ray Halder AGG Lime Service, C.S.
Agro Corp., and Lawrence J. Crist, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
Illinois Central Gulf Railroad Co., Intervenor/Respondent.
 No. 83-1374.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 14, 1983.
Decided Feb. 10, 1984.
Rehearing Denied March 12, 1984.
 
 Marvin Wallace Miller and Gordon P. MacDougall, Washington, D.C., for petitioners.
 Edward J. O'Meara, Washington, D.C., for respondents.
 John H. Doeringer, Chicago, Ill., for intervenor/respondent.
 Before HEANEY and McMILLIAN, Circuit Judges, and HENLEY, Senior Circuit Judge.
 HEANEY, Circuit Judge.
 
 
 1
 On August 1, 1983, the Interstate Commerce Commission (Commission) issued an opinion affirming its January 18, 1983, decision granting the application of the Illinois Central Gulf Railroad (ICG) to abandon a 96-mile branch of rail line between Cherokee, Iowa, and Sioux Falls, South Dakota, called the Sioux Falls District line. This action by the Commission followed our remand of its February 15, 1980, decision to the same effect, Illinois Central Gulf Railroad Abandonment, 363 I.C.C. 93 (1980). City of Cherokee v. ICC, 641 F.2d 1220 (8th Cir.), cert. denied, 454 U.S. 892, 102 S.Ct. 387, 70 L.Ed.2d 206 (1981). Petitioners--the City of Cherokee, several shippers along the Sioux Falls District line, and a representative of the United Transportation Union--protested the abandonment and now petition this Court to review the Commission's January 18 and August 1, 1983, decisions. Because the Commission gave proper consideration to the factors relevant to the abandonment application in this case and applied correct legal standards, we deny the petition for review.
 
 
 2
 We detailed the facts and administrative proceedings underlying ICG's abandonment application as of the Commission's February 15, 1980, decision in our earlier opinion. City of Cherokee v. ICC, supra, 641 F.2d at 1222-1226. We remanded the case to the Commission at that time because it had failed "to properly balance the competing benefits and burdens of all interested parties, as it was required to do by statute" and "to treat certain train crew wages as 'unavoidable costs' when it made its economic computations." Id. at 1222. The Commission reopened the proceeding on November 6, 1981, directing ICG to submit updated and revised evidence and allowing petitioners to submit replies.[1] During hearings in Chicago, Illinois, in January of 1982 and in Cherokee, Iowa, in March of 1982, the Commission accepted new evidence from both ICG and petitioners.
 
 
 3
 The evidence presented on remand painted a much clearer picture of the declining usage of the Sioux Falls District line. ICG adduced evidence showing that the total carloads of freight carried over the line dropped steadily from approximately 7400 in 1974 to under 1000 in 1981. On March 30, 1981, ICG reduced round-trip service over the line from six days per week to thrice weekly. On June 30, 1981, service was further reduced on an "as needed" basis, meaning that runs would only be made when requested by shippers. In April of 1981, ICG published a proposed surcharge of $1004 per car on shipments to or from the Sioux Falls District line. In order to protect our jurisdiction in the abandonment case then on remand, we prevented implementation of the surcharge. City of Cherokee v. ICC, 671 F.2d 1080, 1083-1085 (8th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 140, 74 L.Ed.2d 119 (1982). ICG later cancelled the proposed surcharge altogether, before it was ever billed to any shipper.
 
 
 4
 ICG also submitted exhibits showing that net revenues over the line declined, and then disappeared, during this same period. After recording a net gain of $124,229 in 1975, ICG documented net losses on the operation of the line of $641,622 in 1979, $593,164 in 1980, and $274,918 for the first nine months of 1981 (which included the cut-back in weekly runs after March 30, 1981). The Commission adopted ICG's evidence regarding reduced traffic and increased operating deficits in its January 18 and August 1, 1983, decisions.
 
 
 5
 The Commission also found that ICG incurred an annual opportunity cost of $538,912 as a result of operating the line. "Opportunity costs" are those benefits lost by the railroad because its resources devoted to particular operations are not free to be put to more profitable uses. See Cartersville Elevator, Inc. v. ICC, 724 F.2d 668 at 671, (8th Cir.1984). The opportunity cost of the Sioux Falls District line was computed by multiplying the net liquidation value of the line--$3,227,019--by a 16.7 percent "adequate rate of return" set by the Commission.[2] The Commission adopted the liquidation values for various assets submitted by both ICG and petitioners in arriving at the net liquidation value of the entire line.
 
 
 6
 Besides recent operating losses and the substantial annual opportunity cost of operating the line, the Commission determined that ICG would have to invest $729,778 to rehabilitate the track and two bridges on the run. The need for such rehabilitation was established by comparing the condition of the line with Federal Railroad Administration safety standards.
 
 
 7
 Against these burdens borne by ICG in continuing the operation of the Sioux Falls District line, the Commission balanced the interests of shippers who had used the line and the communities involved. It found that most shippers along the line had significantly reduced their use of ICG's services since the hearing prior to the 1980 abandonment decision. Several shippers had increased their reliance on truck transport in the interim because it was less expensive than rail. The Commission found little or no prospect for increased traffic on the line in the future. It also found that alternative transportation, both by truck and by rail, was available near all points along the line. It further discounted the testimony of the City Administrator for Cherokee regarding the City's need for the line because ICG had agreed to lease its first two miles to local interests in order to encourage development of an industrial park in the City and to provide spur access to ICG's main line operation serving Cherokee. The Commission concluded that the burdens placed on ICG by continued operation of the line far outweighed the benefits accruing to petitioners; stated conversely, the benefits of abandonment on ICG as an interstate rail service provider overshadowed the burdens which petitioners would have to bear in the absence of the Sioux Falls District line. The Commission therefore granted ICG permission to abandon the line.
 
 
 8
 Petitioners contest the Commission's action on several grounds. They argue that the Commission erred in discounting the financial condition of ICG and its corporate parent, IC Industries, in measuring the burden of continued operation of the Sioux Falls District line. They assert that the Commission erroneously considered the opportunity cost associated with continued operation of the line without evidence that line resources would be reinvested in other rail uses. They allege that the Commission erroneously weighed evidence regarding the adequacy of alternative transportation, improperly ignored ICG's freight rate actions following our prior remand in the abandonment case, and wrongly disregarded the needs of the City of Cherokee. Finally, they contend that the Commission's factual findings with regard to avoidable costs and rehabilitation expenses are arbitrary and capricious.
 
 
 9
 The substantive legal standard applicable to abandonment applications is that "present or future public convenience and necessity require or permit the abandonment." 49 U.S.C. Sec. 10903(a) (Supp. V 1981). This standard requires the Commission to balance the respective interests of the carrier, protesting communities and shippers, and interstate commerce generally. See Colorado v. United States, 271 U.S. 153, 168, 46 S.Ct. 452, 455-56, 70 L.Ed. 878 (1926); Georgia Public Service Commission v. United States, 704 F.2d 538, 541 (11th Cir.1983); City of Cherokee v. ICC, supra, 641 F.2d at 1227-1228. The parties to this appeal agree that we review the Commission's findings and conclusions to determine if they comply with the statutory mandate and if they are arbitrary, capricious, or an abuse of discretion.[3] See 5 U.S.C. Sec. 706(2)(A) (1982). We now hold that the Commission on remand properly considered all evidence necessary to ICG's abandonment application in this case and, on balancing the relevant factors, arrived at a reasonable decision to grant that application.
 
 
 10
 First, the Commission did not err in disregarding evidence of ICG's and IC Industries' financial prosperity on the facts before it. The Commission could properly conclude that the prosperity of the carrier may not be important where the public need for an unprofitable line is so minimal that requiring a carrier in a strong overall financial position to continue its operation does not further the general public interest. See Illinois v. ICC, 722 F.2d 1341 at 1348 (7th Cir.1983) (dictum). Petitioners' citation to Southern Railway v. North Carolina, 376 U.S. 93, 84 S.Ct. 564, 11 L.Ed.2d 541 (1964), is not to the contrary.
 
 
 11
 In Southern Railway, the Supreme Court considered the discontinuance of passenger service on a branch line under a federal statute similar to the abandonment legislation here at issue, see 49 U.S.C. Sec. 10909 (Supp. V 1981). The Court affirmed a Commission order allowing discontinuance which gave "little or no weight" to the carrier's overall prosperity. Southern Railway v. North Carolina, supra, 376 U.S. at 96, 105-106, 84 S.Ct. at 566, 571. The Court stated in summary that where "the Commission's findings make clear that the demands of public convenience and necessity are slight * * * it is * * * proper for the Commission, in determining the existence of the burden on interstate commerce, to give little weight to the factor of the carrier's overall prosperity." Id. at 105. This language indicates that in most cases even a slight public need for a line proposed for abandonment will require consideration of the carrier's overall financial ability to bear branch line losses or minimal branch line profits. Where the Commission finds extremely limited use of the branch line with no hope of future increases and a "hopelessly unprofitable operation," however, we cannot read Southern Railway to require a pro forma consideration of evidence incapable of tipping the balance against abandonment.
 
 
 12
 Second, we find the Commission's consideration of opportunity costs in this case is not a factor requiring reversal even if improperly conducted. See Simmons v. United States, 698 F.2d 888, 894-895 (7th Cir.1983); Illinois v. ICC, 698 F.2d 868, 873 (7th Cir.1983). The rate of return for this branch line, which reflected large operating losses, was substantially less than for the carrier as a whole. These annual operating losses, coupled with necessary rehabilitation expenses on the line, made consideration of opportunity costs to establish ICG's heavy burden in continuing the Sioux Falls District line unnecessary. Thus, whether we accept the majority or dissent in Cartersville Elevator on this issue, abandonment in this case will further a policy goal of revenue adequacy and we decline to decide here whether the Commission's dispositive reliance on opportunity costs in other cases is justified. See Cartersville Elevator, Inc. v. ICC, supra, at 673-675; id. at 675-677 (Fagg, J., dissenting).
 
 
 13
 Third, we hold that the Commission's handling of the alternative transportation, proposed surcharge, and community impact issues was proper. Contrary to petitioners' claim on appeal, the Commission did not find transportation alternatives to the Sioux Falls District line adequate because affected shippers would not "terminate" with the abandonment of the line; rather, it merely considered as one factor that no shipper was so dependent on the line that it would have to relocate or close should the line be abandoned. As for the proposed surcharge, which we blocked prior to implementation, the Commission correctly noted that petitioners presented no specific evidence that this proposal reduced use of the line nor any indication of the extent of such purported reduction. With regard to the testimony of the City Administrator of Cherokee, the Commission found that the concerns of the City were minimal given ICG's agreement to lease the first two miles of track within Cherokee's city limits to local interests. The Commission did not need to give further consideration or more weight to any of these factors.
 
 
 14
 Finally, we find ample record support and fair reasoning underlying the Commission's factual findings regarding avoidable costs and rehabilitation expenses which ICG can save by abandoning the Sioux Falls District line. The record developed on remand answers the concerns we had previously with regard to the inclusion of train crew wages as avoidable costs of operating the line. See City of Cherokee v. ICC, supra, 641 F.2d at 1228-1229. The record contains testimony demonstrating that neither ICG nor the union intended the "tabulated local rule," guaranteeing pay for conductors and brakemen, to compensate these employees as a "sit-down" crew in the event of an abandonment of the line. As for wages for engineers and firemen on the line, the record supports the Commission's conclusion that these employees will be put to productive use elsewhere for ICG, thus avoiding the payment of wages for unproductive Sioux Falls District line service. While the Commission's blanket assertion that all of these employees will fill existing vacancies is a broad construction of ICG's evidence, we find that any error in this statement would be so minimal as to have no effect on the ultimate administrative decision to grant abandonment. See Simmons v. United States, supra, 698 F.2d at 894-895; Illinois v. ICC, supra, 698 F.2d at 873.
 
 
 15
 In addition, the Commission's inclusion of certain off-branch costs in calculating the loss attributable to the Sioux Falls District line is supported by the record and reflects a reasonable measure of those costs. In the same manner, the calculation of rehabilitation expenses necessary to continue the safe operation of the line is not arbitrary, capricious, or an abuse of discretion.
 
 
 16
 In sum, we have carefully considered the record underlying the January 18 and August 1, 1983, decisions granting ICG's abandonment application. That record and the reasoning of the Commission adequately answered any questions we had regarding the application in our earlier opinion, and we cannot say that the Commission on remand exceeded its authority under the abandonment statute, acted in an arbitrary or capricious manner, or otherwise abused its discretion. Constrained by this narrow scope of review, therefore, we deny the petition for review.
 
 
 
 [1]
 Our earlier decision did not foreclose further investigation by the Commission in this manner. Our direction that the Commission "properly balance the benefits and burdens that would inure to both the carrier and the communities upon either abandonment or forced continued operation of the line" could best be followed by the consideration of current data, as the Commission did on remand and reopening below. City of Cherokee v. ICC, 641 F.2d 1220, 1230 (8th Cir.), cert. denied, 454 U.S. 892, 102 S.Ct. 387, 70 L.Ed.2d 206 (1981)
 
 
 [2]
 The adequate rate of return used by the Commission to calculate opportunity costs has varied substantially in recent years. See Cartersville Elevator, Inc. v. ICC, 724 F.2d 668 at 671 n. 4 (8th Cir.1984) (10.2 percent rate); Illinois v. ICC, 698 F.2d 868, 875 (7th Cir.1983) (9.3 percent rate); Abandonment of Railroad Lines--Use of Opportunity Costs, 367 I.C.C. 734, 734 (1983) (22.3 percent rate; policy statement by the Commission)
 
 
 [3]
 Some courts have questioned whether the "substantial evidence" test of 5 U.S.C. Sec. 706(2)(E) (1982) applies to appellate review of Commission abandonment decisions because those decisions are not made "on the record" as required by that statute. E.g., Georgia Public Service Commission v. United States, 704 F.2d 538, 542 n. 8 (11th Cir.1983); Simmons v. United States, 698 F.2d 888, 894 n. 3 (7th Cir.1983). We agree with the parties to this case that as a practical matter a decision based on findings unsupported by substantial evidence may be considered arbitrary and capricious