STATE CORPORATION COMMISSION, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

and

Missouri Pacific Railroad Company, Intervenor–Respondent.

No. 86–2470.

United States Court of Appeals, Tenth Circuit.

Dec. 5, 1989.

Publication Ordered Jan. 31, 1990.

Frank A. Caro, Jr., Gen. Counsel, and Glenda L. Cafer, Asst. Gen. Counsel, Kan. Corp. Com'n, Topeka, Kan., for petitioner State Corp. for State of Kan.

Robert S. Burk, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, and Evelyn G. Kitay, Interstate Commerce Com'n, Washington, D.C., for respondent Interstate Commerce Com'n.

Charles F. Rule, Asst. Atty. Gen., Catherine G. O'Sullivan and David Seidman, Dept. of Justice, Antitrust Div., Washington, D.C., for respondent U.S.

Joseph D. Anthofer, Gen. Atty., Omaha, Neb., for intervenor-respondent Mo. Pacific R. Co.

T.L. Green, T.L. Green & Associates, P.A., Topeka, Kan., filed an amicus curiae brief for Northeast Kan. Rail Users Ass'n.

Before McKAY and BRORBY, Circuit Judges and BOHANON,[*] District Judge.

BOHANON, Senior District Judge.

The State Corporation Commission for the State of Kansas ("KCC") seeks review of an order of the Interstate Commerce Commission ("ICC") which granted the Missouri Pacific Railroad Company ("MP") the right to abandon 66 miles of track. KCC is primarily challenging several findings of the ICC and the sufficiency of the underlying evidence.

In accordance with 49 U.S.C. § 10903, MP filed an application with the ICC in December 1985. The application was revised in March 1986 seeking abandonment of 66 miles of railway between milepost 337.8 near Parnell and milepost 403.8 near Vliets in Atchison, Jackson, Nemaha, and Marshall Counties, Kansas.[1] In addition to a protest filed by KCC, twenty-six protests and objections to the abandonment were filed.

On February 10, 1986, the ICC instituted an investigation into the application and set the proceeding for handling under the modified procedure. The ICC also reversed a prior order and instructed MP to submit data concerning overhead or bridge traffic.[2]

Evidence and arguments were presented to the ICC. Several interested parties filed verified statements concerning the impact of the potential abandonment of the track on the local economy and of other potential hardships on the area. Also, MP presented evidence relating to the income and the losses resulting from the operation of the line.

The primary issue is whether the ICC's decision to allow MP to abandon the line segment involved here was proper. The Administrative Procedure Act sets forth the standard of review as follows: "The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2) (1977). Since the ICC's decision is presumptively valid, this court's review of the decision is limited to a determination of whether there is sufficient evidence to support the decision. *Curtis, Inc. v. ICC,* 662 F.2d 680, 685 (10th Cir.1981). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Id.* Based on this standard of review, we must affirm the ICC's decision.

### Bridge or Overhead Traffic

The first argument that KCC sets forth is that the trial court erred in failing to consider revenues from the transportation of bridge or overhead traffic over the subject line. After considering the evidence, the ICC determined that "the bridge

* The Honorable Luther Bohanon, Senior United States District Judge for the Eastern, Northern and Western Districts of Oklahoma, sitting by designation.

1. In the original application filed in December 1985, MP sought to abandon 71.5 miles of track.

In the revised application, MP sought to abandon only 66 miles of track.

2. Bridge or overhead traffic is traffic which does not originate or terminate at a point on the 66 miles of the subject railway.

traffic is irrelevant to the abandonment of the line at issue here." We agree with this determination.

The ICC determined that the overhead traffic could be effectively moved over a parallel line between Frankfort and Kansas City via Topeka. Thus, MP's revenues for the subject line would be unaffected by the revenues from the overhead traffic. If revenues are unaffected by abandonment, they should not be considered when determining to what extent a section of line is profitable. *Illinois v. ICC*, 722 F.2d 1341, 1345–46 (7th Cir.1983). "[L]ocal shippers who are unable to support a railroad cannot demand continued rail transportation simply because the branch is used for movement of through traffic which could be handled as expeditiously over other routes." *Illinois v. ICC*, 698 F.2d 868, 873 (7th Cir.1983), *quoting Baltimore Ohio Railroad Co. Abandonment*, 354 I.C.C. 240, 244 (1978).

### Revenue Evidence

KCC argues that the ICC created a presumption that MP's revenue statistics were correct and improperly accepted actual transit revenues for the six months of 1985 as rebuttal. We cannot find that the ICC created a presumption in favor of MP that its statistics were correct. In a detailed discussion the ICC found that the protestants' figures were flawed or were presented without an explanation of the underlying facts on which they were based. For example, KCC included revenues from overhead traffic in its operations revenues. Thus, KCC's figures were defective. Two of the protestants submitted figures which also showed a loss to MP making it irrelevant whether those two protestants' figures were accepted over MP's figures. Further, the ICC did not accept MP's figures for the investment return on locomotives.

■ The ICC allowed MP to substitute actual figures for the last six months of 1985. MP had originally submitted only estimates since the actual figures were unavailable. KCC argues that this decision constituted reversible error but concedes that actual figures are preferable to estimates. Further, the actual figures were higher than KCC's figures, and KCC has not argued that the actual figures were inaccurate. If the agency did commit an error, it did not prejudice KCC to its detriment and was thus harmless.

### Alternate Transportation

KCC argues that the agency erred in finding that adequate alternate transportation was available. The KCC agrees that trucking is the only real alternative available. Only two to three percent of the grain from the area is transported by rail; the remaining grain is transported by trucks. None of the elevators contended that the abandonment would result in their closure. The court found trucking was an adequate alternative.

KCC cites *Georgia Public Service Commission v. United States*, 704 F.2d 538 (11th Cir.1983), in support of their position. We agree that to have meaning, "adequate alternative transportation" must be interpreted to require transportation which is both logistically and economically feasible. Unlike *Georgia Public Service* where there was virtually no evidence to support a finding of alternative transportation, here there is substantial evidence to support the agency's finding. The protesting elevators' answers to MP's interrogatories indicate that the elevators regularly used motor service and that there existed at least six grain-hauling motor carriers in the area. None of the protesting elevators indicated that the abandonment of the line would result in closure of the elevator. Also between 97 and 98 percent of the grain is presently transported by motor carrier. In light of the evidence, the agency did not err in finding that adequate alternative transportation exists.

### Impact on Involved Communities

KCC also argues that the agency erred in finding that the abandonment would have no serious adverse effect on the communities involved. KCC substantially makes the same argument that it did regarding adequate alternative transporta-

tion; since no alternative transportation exists, the abandonment will have a serious adverse impact on the communities involved. We addressed KCC's argument earlier.

The agency considered the additional costs to the counties for upkeep and repair of roads and bridges. The MP averred that the costs proposed by the protestants were speculative and unsupported by the evidence. The speculative nature of the evidence is confirmed by the disparity among the protestants' estimates.

The agency also considered environmental issues and labor protection to evaluate the impact of the abandonment on the communities. KCC has not alleged that the agency's findings regarding these two factors were in error. The agency's decision regarding the impact on the communities involved is supported by substantial evidence.

### Perfection for Abandonment

Lastly, KCC argues that the ICC erred in finding that MP did not perfect the line for abandonment. KCC urges that MP deliberately downgraded the line for abandonment by not matching motor carrier rates, by offering certain alternate routings, and by allowing car shortages to occur. The agency correctly found that MP did not perfect the subject section of line for abandonment.

MP was not required to set rates competitive with those of motor carriers. The truck distances are shorter than the rail distances and many of the trucks are owned by the owner-operators who do not have terminal costs. Given these facts, MP has not been able to provide rates which are competitive with the motor carrier. Further, there was no showing that if MP had provided rates at or near the level of motor carrier that MP would have made a reasonable profit on the subject line.

MP presented plausible reasons for its routing decision and car usage. Further, routing and car usage are discretionary management decisions. Given the business reasons for MP's routing and car usage decisions, we cannot say the agency incorrectly found that MP did not perfect the line for abandonment.

### Conclusion

A decision to allow an abandonment involves balancing " '[t]he benefits to particular communities and commerce of continued operation [against] the burden thereby imposed upon other commerce.' " *Georgia Public Service Commission* at 541, *quoting Colorado v. United States,* 271 U.S. 153, 168, 46 S.Ct. 452, 455–56, 70 L.Ed. 878 (1926). In determining whether abandonment is proper, the agency must consider the profitability of the line as well as the affect on the communities involved. "Where there is substantial support in the record for the Commission's findings, it is not the court's function 'to substitute its own conclusions for those which the Commission had fairly drawn from such findings.' " *Illinois v. ICC,* 698 F.2d at 871, *quoting Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). Here there is substantial support for the agency's decision.

It is apparent from the agency's written opinion that it carefully considered the relevant factors and then balanced the competing interests. The agency then decided that abandonment of the line was proper. The ICC's decision was in accord with the evidence and the law, and we must affirm.